The **HOPE CLINIC, Marilynn Conners Frederiksen, M.D., Norman A. Ginsberg, M.D., Cassing Hammond, M.D., Lauren Streicher, M.D., David Zbaraz, M.D., et al., Plaintiffs,**

v.

**James RYAN, Attorney General of the State of Illinois, in his official capacity; Richard Devine, State Attorney for Cook County, in his official capacity, Defendants.**

No. 97 C 8702.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 12, 1998.

Colleen K. Connell, Morris Lipson, Roger Baldwin Foundation of ACLU, Inc., Lorie Ann Chaiten, Diane Ilene Smason, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Hope Clinic, Marilynn Conners Frederiksen, M.D., Norman A Ginsberg, M.D., Cassing Hammond, M.D., Lauren Streicher, M.D., David Zbaraz, M.D., et al., Plaintiffs.

Roger Philip Flahaven, Thomas A. Ioppolo, Illinois Attorney General's Office, Chicago, IL, for James Ryan, Attorney General of the State of Illinois, in his official capacity; Richard Devine, State Attorney for Cook County, in his official capacity, Defendants.

### MEMORANDUM OPINION

KOCORAS, District Judge.

Plaintiffs, the Hope Clinic and several doctors, bring this action against defendants, the Attorney General of the State of Illinois and the State's Attorney for Cook County, in their official capacities, pursuant to 42 U.S.C. §§ 1983 and 1988, and pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek declaratory and injunctive relief from this court to prevent House Bill 382 ("HB 382"), the Partial–Birth Abortion Ban Act (the "Act"), from taking effect on February 13, 1998. This Act imposes criminal and civil penalties against individuals who perform "partial-birth abortions". Plaintiffs challenge the constitutionality of the Act on the grounds that it is vague and unduly burdensome in violation of the Due Process Clause of the Fourteenth Amendment and that it endangers the health and life of women in violation of the Equal

Protection Clause of the Fourteenth Amendment.

This matter is before the court on the plaintiffs' motion for a preliminary and permanent injunction. Plaintiffs assert that an injunction is necessary to prevent irreparable harm to themselves and their patients from the statute's chilling effect on their ability to provide abortion services. Plaintiffs contend that they can demonstrate actual success on the merits of their claims by proving that the Act is facially vague and unduly burdensome on a woman's right to seek an abortion. In addition, they assert that injunctive relief will serve the public interest in that it will protect the constitutional rights of women.

Twenty-five years after the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, this country is still deeply divided over whether a woman should have the right to terminate her pregnancy and the extent of that right. Although the abortion issue divides people on moral, religious and political grounds, this court is bound to resolve questions on the extent of a woman's constitutional right to an abortion on legal grounds. The court has reviewed the parties' briefs, the affidavits and declarations from plaintiffs' experts, and Supreme Court authority. For the reasons set forth below, the court grants the plaintiffs' motion for a preliminary and permanent injunction. Before addressing the merits of the plaintiffs' motion, the court will identify the parties to this dispute, outline the challenged legislation, and describe the abortion procedures used in Illinois that may be within the legislation's reach.

## I. THE PARTIES

The parties in this action are as follows. The Hope Clinic for Women, Ltd., provides abortions and abortion-related services including testing, non-directive options counseling and post-abortion birth control services, in Granite City, Illinois. The Hope Clinic provides abortions to women from the fifth week to the twenty-fourth week of pregnancy as measured from the woman's last menstrual period ("LMP").

The remaining plaintiffs are physicians licensed to practice in the State of Illinois. Plaintiff Marilynn Conners Frederiksen, M.D., is the Section Head for General Obstetrics and Gynecology at Northwestern Memorial Hospital. She is an Associate Professor in Obstetrics and Gynecology and in Clinical Pharmacology at Northwestern University Medical School in Chicago. She has been certified by the American Board of Obstetrics and Gynecology as a Maternal-Fetal Medicine Specialist. Moreover, Dr. Frederiksen is a Diplomate of the Board. Dr. Frederiksen provides a number of services to her patients including prenatal care, fetal diagnoses, labor and delivery, fetal therapy and abortion usually between six and twenty-four weeks LMP.

Plaintiff Norman A. Ginsberg, M.D., is an Assistant Professor of Clinical Obstetrics and Gynecology at Northwestern University Medical School. He is a Diplomate of the American Board of Obstetrics and Gynecology and a Fellow of the American College of Obstetrics and Gynecology. Dr. Ginsberg is a founding member of the International Society of Obstetrical and Gynecological Ultrasound, a member of the Society of Perinatal Obstetricians, and holds an Affiliate Doctoral from the American College of Medical Genetics. He is a member of the American Medical Association and the International Fetal Medicine and Surgery Society. Dr. Ginsberg also serves on the Editorial Board of the *Journal of Reproduction and Genetics*. Dr. Ginsberg provides abortions until twenty-four weeks LMP.

Plaintiff Cassing Hammond, M.D., is an Instructor of Obstetrics and Gynecology at Northwestern University Medical School, and actively engages in the practice of obstetrics and gynecology, including providing abortion services. Dr. Hammond is a Fellow of the American College of Obstetrics and Gynecology and a member of the Association of Professors of Gynecology and Obstetrics.

Plaintiff Lauren Streicher, M.D., provides a broad range of services including, gynecological care, pre-natal care, labor and delivery, and abortion. She is a Clinical Instructor of Obstetrics and Gynecology at Northwestern University Medical School. Dr. Streicher is a Diplomate of the American Board of Obstetrics and Gynecology and her admission to become a Fellow of the American College of Obstetrics and Gy-

necology is pending. Dr. Streicher serves on the Early Detection Committee of the American Cancer Society, Illinois Division, and the Medical Board of Planned Parenthood of Chicago.

Plaintiff David Zbaraz, M.D., is a Clinical Assistant Professor of Obstetrics and Gynecology at Northwestern School of Medicine. He is a Diplomate of the American Board of Obstetrics and Gynecology and a Fellow of the American College of Obstetrics and Gynecology. Dr. Zbaraz is also a member of the American Medical Association, the Illinois State Medical Society and the Chicago Medical Society. Dr. Zbaraz provides a broad range of services, including prenatal care, fetal diagnoses, labor and delivery, and abortion.

The plaintiffs bring this suit individually and as a class action on behalf of all duly licensed physicians, surgeons and medical researchers desiring to perform or conduct medical research relating to pregnancy terminations, patients seeking abortion services, and minors capable of giving informed consent to an abortion procedure or whose best interests would be served by an abortion. Plaintiffs bring suit against defendant James Ryan, Attorney General for the State of Illinois, in his official capacity, and against defendant Richard Devine, State's Attorney for Cook County, in his official capacity.

## II. THE CHALLENGED LEGISLATION

HB 382 bans "partial-birth abortions". A "partial-birth abortion" is defined as "an abortion in which the person performing the abortion partially vaginally delivers a living human fetus or infant before killing the fetus or infant and completing the delivery." The terms "fetus" and "infant" are defined as the "biological offspring of human parents." The phrase "partially vaginally delivers" is not defined in the statute, nor are the terms "deliver" or "living".

The ban does not apply to a partial-birth abortion that is necessary "to save the life of a mother because her life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering condition caused by or arising from the pregnancy itself, provided that no other medical procedure would suffice for that purpose." There is no exception to the ban in circumstances when the woman's health is endangered, when the woman suffers from conditions or illnesses other than those enumerated, such as mental conditions or disorders, or when the woman's health is endangered by the pregnancy itself or is compromised by the alternative abortion procedure. Finally, the Act does not make a distinction as to the viability of the fetus.

The Act also provides that a person who "knowingly" performs a partial-birth abortion is guilty of a Class 4 felony. The penalty for a Class 4 felony is imprisonment for not less than one year and for as many as three years, and includes a fine of as much as $10,000. 730 ILCS 5/5 §§ 5–8–1(a)(7), 5–9–1(a)(1). A physician convicted of a felony risks having her license revoked or suspended by the Department of Professional Education and Registration. 225 ILCS 60/22 (A)(3). In addition, a physician who violates the Act may be subject to civil suits by the "maternal grandparents of the fetus" if the mother is under the age of 18 years at the time of the abortion and the plaintiff did not consent to the procedure. There is an exception to such civil suits if the pregnancy of the minor resulted from the plaintiff's criminal conduct. Physicians subject to these civil suits may be liable for money damages for all psychological and physical injuries resulting from the partial-birth abortion, and statutory damages equal to three times the cost of the partial-birth abortion.

## III. ABORTION PROCEDURES

In order to properly understand the parties' arguments as to the breadth and vagueness of the Act, it is necessary to understand the various abortion procedures utilized by physicians in Illinois. The court's description of these procedures is taken from the affidavits and declarations of the five named plaintiffs and the affidavits of Julie R. Adams and Beth A. Fine, M.S., C.G.C., who provide counseling to women seeking abortions and have specialized knowledge of the circumstances under which women seek abortions. Plaintiffs have moved this court to qualify the plaintiff-physicians, Adams, and Fine as experts. Defendants do not object to this motion or to the medical opinions and facts

contained in the affidavits, but have objected to portions of the affidavits that they claim contain legal conclusions and speculation, or lack foundation.

■■■ A district court has broad discretion to admit or rely on expert testimony. *See Miksis v. Howard,* 106 F.3d 754, 762 (7th Cir.1997). Expert testimony is admissible if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.Evid. 702. Moreover, experts are permitted to testify as to the ultimate issue in a case. *Moore v. Wesbar Corp.,* 701 F.2d 1247, 1253 (7th Cir.1983). In this case, the court will rely on the statements made by the physician-plaintiffs in their affidavits and declarations as to the various abortion procedures used, the reasons women obtain abortions, their understanding of the ban on partial-birth abortions, and its effect on their practice. For these reasons, we grant the plaintiffs' motion for qualification of experts inasmuch as these matters are within the scope of their established expertise.

Abortion is one of the safest surgical procedures in terms of mortality and morbidity, and it is much safer than continuing the pregnancy through childbirth. In the first trimester of pregnancy, when most abortions are performed, a woman is twenty times more likely to die from continuing the pregnancy through childbirth than from a first-trimester abortion. At any stage of pregnancy, a woman is ten times more likely to die from continuing the pregnancy through childbirth than from an abortion. The risk of death from abortion, however, increases approximately 30% with each week of gestation from eight weeks LMP to twenty weeks LMP. The risk of major complications increases approximately 20% with each week of gestation from seven weeks onward. When performing an abortion, the physician chooses the procedure most appropriate for a particular patient. This decision is based on a number of variables, including the underlying health conditions of the patient, the stage of pregnancy, the condition of the fetus, the position of the fetus, the skill and training of the physician, and the facilities available.

The term "partial-birth" abortion is not a medical term and does not denote a specific abortion procedure. Rather, the doctors described six abortion procedures: (1) administration of agents such as RU 486 and methotrexate, for early first-trimester abortions; (2) suction curettage; (3) dilation and evacuation procedures ("D & E"); (4) induction procedures; (5) hysterotomy; and (6) hysterectomy. Because RU 486 and methotrexate are not available in the United States except as part of clinical trials, the court will not address them in the context of the partial-birth abortion statute.

## A. Suction Curettage

For first-trimester abortions, most physicians in Illinois use suction curettage, also called vacuum aspiration. In this procedure, the physician mechanically dilates the cervix and then removes the embryo or fetus and the other products of conception with a tube or syringe that is inserted in the uterus. The tube is attached to a vacuum generator, which provides suction to empty the contents of the uterus. During the procedure, the fetus can come through the suction tube either intact or dismembered. While dismembered parts of the fetus are suctioned out of the uterus, part of the fetus remains in utero and may be "alive," which the experts define as having a heartbeat.

## B. D & E

At the end of the first-trimester and thereafter, most physicians generally use either the D & E procedure, which accounts for 95% of post-first trimester abortions nationally, or induction, which accounts for 5% of such abortions. In a D & E procedure, a physician begins by dilating the cervix over a period of hours with multiple intracervical osmotic dilators, which absorb moisture and expand slowly in the cervix. When the cervix is sufficiently dilated, the physician removes the dilators and ruptures the amniotic sac. Then, using a combination of suction curettage and forceps, the physician removes the fetus. The fetus is usually removed in parts, but at times, the physician can remove the fetus intact. Because the calvarium (skull) is often too large to pass through the cervix whole, the physician must either collapse it with forceps or use suction to remove

the calvarium's contents. A number of factors affect the progression of this procedure, including the size and orientation of the fetus, the amount of dilation, the condition of the cervix and uterus, and the patient's overall health and medical condition. The physician adapts her technique in light of the individual patient's needs.

Physicians sometimes use a variation of this procedure, particularly in the late second-trimester, referred to as the intact D & E or the D & X. In an intact D & E, the physician extracts the fetus intact, feet first, until the cervix is obstructed by the fetal skull. Because the fetal skull is too large to pass through the cervix, it must be decompressed either with forceps or by inserting a sharp instrument at the base of the fetal skull and evacuating the contents. The intact D & E is particularly useful in cases of fetal abnormalities because geneticists often request that the fetus be removed intact to facilitate genetic testing. In addition, the intact D & E reduces the risk of retained tissue and reduces the risk of uterine perforation and cervical laceration because the procedure requires less instrumentation in the uterus. An intact D & E may also result in less blood loss and less trauma for some patients and may take less operating time.

The D & E procedures are particularly important for women whose fetuses have genetic or congenital anomalies. Some of these anomalies are fatal within days, or even minutes, of birth. Because most fetal anomalies cannot be detected before the sixteenth to eighteenth week LMP, and the results of these tests do not come back until two to four weeks after the test was taken, the D & E procedures are extremely important because they can be used to terminate these pregnancies safely. Another advantage of the D & E procedures is that they entail lower rates of maternal health complications, including fever, endometritis, retained products of conception, hemorrhage, and cervical injury. The safety of the D & E depends upon the skill and training of the physician because the procedure involves the use of sharp instruments inside the uterus.

### C. Induction

Another method of performing second-trimester abortions is to administer medications that induce premature labor. Inductions generally are not done before sixteen weeks LMP because prior to that point, the uterus is less responsive to labor-inducing medications. Inductions are performed in a hospital or hospital-like setting by using a combinations of the following: intravenous injection of oxytocin, continuously over many hours; introduction of prostaglandins into the vagina or cervix; insertion or laminaria into the cervix; and instillation of urea in the amniotic sac, by injection through the abdomen. Sometimes a separate procedure is necessary to remove the placenta and other remaining products of conception. During some inductions, the umbilical cord may become entangled and the physician must cut it to complete the delivery. In rare instances when the fetus is still alive, cutting the cord can cause fetal death in six to ten minutes.

Inductions are medically inappropriate for some women, such as women with cardiac conditions, active pelvic infections, or when the woman has had a previous hysterotomy or classical caesarean section. Because high doses of labor-inducing medications are used in inductions, severe metabolic disturbances and fatal heart, lung and kidney conditions may also result. Complications associated with full-dose saline instillation can result in hemorrhage in all major organs including the brain. Prostaglandin instillation can cause cervical trauma, severe gastrointestinal side-effects, infection, hemorrhage and sudden death. Certain types of inductions are also contraindicated for women with sickle cell anemia, hypertension, kidney disease, epilepsy, asthma, certain types of glaucoma, and pulmonary hypertension.

There are a number of disadvantages associated with inductions as compared to D & E procedures. Inductions take longer than D & Es, require hospital stays, are costly, and entail levels of pain and trauma similar to the levels experienced during labor and delivery at full-term. Moreover, the maternal mortality rate of induction procedures is almost twice that of D & E procedures, although the rates are comparable for post-sixteen week procedures. Compared to inductions, D & E procedures have lower rates of maternal health complications, including fever, endom-

etritis, retained products of conception, hemorrhage and cervical injury. Another advantage of D & Es over induction procedures is that D & Es can be performed in the earliest weeks of the second-trimester while inductions are generally not effective until the sixteenth week LMP. Thus, inductions require a woman to delay her abortion, thereby increasing the risks involved. On the other hand, inductions have a lower rate of uterine perforation than the rate of such perforations when D & E procedures are used.

## D. Hysterotomy and Hysterectomy

Many years ago, hysterotomy and hysterectomy were used to terminate second-trimester pregnancies. A hysterotomy is essentially a pre-term caesarian section. The physician makes an incision in the uterine wall and removes the fetus, through the abdomen. Women who have had hysterotomies are at significantly greater risk of uterine rupture in subsequent pregnancies. Uterine rupture can be associated with catastrophic bleeding. Hysterectomy is the removal of the uterus and renders the woman sterile. Hysterectomy entails greater surgical risk and prolonged recovery time. Both procedures entail major abdominal surgery with risks far greater than the other abortion methods described. The mortality rate associated with hysterotomy and hysterectomy is more than seven times that associated with instillation abortion and more than ten times that associated with D & E procedures. The experts agree that these two procedures are almost never medically appropriate.

## IV. LEGAL STANDARD FOR INJUNCTIVE RELIEF

█ Plaintiffs seek a preliminary and permanent injunction from this court to prevent defendants from enforcing HB 382, the Partial–Birth Abortion Ban Act. This court must consider four traditional criteria in deciding whether to grant preliminary injunctive relief: (1) whether the plaintiffs have a reasonable likelihood of success on the merits; (2) whether the plaintiffs have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the injury to the plaintiffs from denying injunctive relief outweighs the harm to the defendants from granting the injunction; and

(4) whether the public interest will be served by granting the injunction. *Plummer v. American Institute of Certified Public Accountants,* 97 F.3d 220, 229 (7th Cir.1996) (citing *N.L.R.B. v. Electro–Voice, Inc.,* 83 F.3d 1559, 1567 (7th Cir.1996), *cert. denied,*—— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997)).

█ The standard for a permanent injunction is essentially the same as for a preliminary injunction except that in seeking a permanent injunction, a plaintiff must prove actual success on the merits rather than a likelihood of success on the merits. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). Moreover, a permanent injunction is not provisional in nature but rather, it is a final judgment. *Plummer,* 97 F.3d at 229 (citing *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273, 275 (7th Cir.1992)). With these principles in mind, we begin our substantive review of the statute.

## V. DISCUSSION

As stated above, plaintiffs must show actual success on the merits of their claim that HB 382 is unconstitutional. Plaintiffs offer three reasons for declaring the statute unconstitutional: (1) the statute is vague; (2) the statute unduly burdens the constitutional rights of women seeking abortions; and (3) the statute impermissibly requires third-party consent from the parents of a minor seeking an abortion.

### A. Vagueness

█ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Due process demands that statutes give fair warning as to the conduct that is prohibited. *Id.* Without such warning as to the meaning of a statute, people will "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964)). A statute,

therefore, is void for vagueness if people of "ordinary intelligence" are forced to guess at the meaning of the statute and differ as to its application. *See Grayned*, 408 U.S. at 108; *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974). Moreover, a statute is void for vagueness if it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299.

 Perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979). Moreover, the standard of certainty that due process requires is higher when a statute imposes criminal penalties. *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983). Failure to satisfy the more stringent standard in cases where constitutional rights or criminal penalties are involved necessitates a finding that the law is unconstitutionally vague. *Evans v. Kelley*, 977 F.Supp. 1283, 1304 (E.D.Mich.1997) (citing *Kolender*, supra). This is true even though the law could conceivably have some constitutional applications. *Colautti*, 439 U.S. at 391, 99 S.Ct. at 683; *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1859. With these principles in mind, we review HB 382.

 HB 382 bans "partial-birth abortions". A "partial-birth abortion" is defined as an abortion in which the physician "partially vaginally delivers" a "living" fetus before killing the fetus and completing the delivery. The phrase "partially vaginally delivers" is not defined in the statute. The term "living" is also not defined in the statute. Because persons of ordinary intelligence are forced to guess as to the meaning of the phrase "partially vaginally delivers" and the term "living," the court must find the statute void for vagueness. The statute simply does not provide fair notice to individuals who are subject to the statute as to the conduct that is prohibited.

The phrase "partially vaginally delivers" is subject to more than one interpretation. The term "deliver" or "delivery" is given a broad meaning in obstetrics. Anything that is removed from the uterus, whether it is a fetus, a fetal part, or a baby, is "delivered." Thus, in every abortion procedure, except hysterotomy and hysterectomy, a fetus or a fetal part is "delivered." Given this broad meaning of the term "delivery," the phrase "partially vaginally delivers" can encompass two distinct situations. On the one hand, "partially vaginally delivers" may describe a situation where an intact fetus is delivered in part through the uterus. On the other hand, "partially vaginally delivers" may describe a situation where part of a fetus is delivered through the uterus. *See* Ginsberg Affidavit, ¶ 16; Hammond Declaration, ¶ 27; Zbaraz Affidavit, ¶ 15.

The term "living" also has more than one meaning and may be interpreted differently by people of "ordinary intelligence". One dictionary defines "living" as "possessing life; alive." THE AMERICAN HERITAGE DICTIONARY 737 (2d College ed.1982). The term "life" is defined as "[t]he property or quality that distinguishes living organisms from dead organisms ... manifested in functions such as metabolism, growth, response to stimuli, and reproduction." *Id.* at 728. The term "life" can also signify "[t]he interval of time between birth and death." *Id.* Physicians define the term "living" as "having a heartbeat." The physicians' definition, therefore, extends the dictionary definition to a time before birth. As such, their definition encompasses situations where fetal parts have been "delivered" but the remaining part continues to have a heartbeat. Without a clear definition in the statute as to the meaning of the term "living," a physician cannot know whether her conduct falls within the statute's reach.

In almost every abortion procedure, with the exception of hysterotomy and hysterectomy, either a delivery of a partial fetus or a partial delivery of an intact fetus may occur. In a suction curettage procedure, a tube is inserted in the uterus and fetal parts are

evacuated through the cervix and into the vaginal canal. While these parts are being evacuated, other parts of the fetus remain in the uterus. These remaining parts may be "living" if there is a heartbeat. When this happens, the physician may have "partially vaginally delivered" a "living" fetus. In D & E procedures, the physician removes the fetus with forceps and suction curettage. In so doing, a physician may "deliver" or "partially deliver" an intact, living fetus or a part of a "living" fetus that continues to have a heartbeat. In either instance, the physician may have performed a "partial-birth abortion" as defined in HB 382. Frederiksen Decl. ¶ 50; Ginsberg Aff. ¶ 17; Hammond Decl. ¶ 27; Zbaraz Aff. ¶ 15. When beginning a suction curettage procedure or a D & E procedure, a physician cannot predict whether a part of a fetus or an intact fetus will be "delivered," or whether a part of the fetus with a heartbeat will remain in the uterus.

The phrase "partially vaginally delivers" may also encompass some cases of induction and cases where a woman spontaneously aborts her fetus. In some cases of induction, the umbilical cord becomes entangled and must be cut by the physician in order to complete the delivery. In those rare instances when the fetus is still "alive," cutting the cord may cause its death within six to ten minutes. In completing the delivery during this time period, the physician may have "partially vaginally deliver[ed]" a living fetus. Hammond Decl. ¶ 28; Zbaraz Aff. ¶ 16; Ginsberg Aff. ¶ 18. In addition, in cases where a woman spontaneously aborts, it may be in her best interests for the physician to complete the abortion. Again, part of the "living" fetus may remain in the cervical os while other fetal parts are "delivered" by the physician. Hammond Declaration, ¶¶ 30–33.

The phrase "partially vaginally delivers" is undefined, ambiguous and subject to more than one interpretation. Likewise, the terms "living" and "delivery" are undefined and subject to more than one interpretation. The law's drafters may have intended to define these terms in a way that differs from the medical definition of such terms. Physicians cannot determine whether the legislature intended to ban a specific practice or entire abortion procedures. As such, they will steer far wider of the unlawful zone and refuse to perform many abortion procedures even if those procedures are not proscribed by the statute. Defendants argue that common-sense dictates that the legislature intended to proscribe situations in which an intact, living fetus is partially or entirely brought out of the uterus and into the birth canal. However, when people of ordinary intelligence are confused as to the statute's meaning and differ as to the interpretation of the statute, common-sense dictates that the statute is unclear and ill-defined.[1] This is especially the case when the people whose conduct is directly implicated by the statute cannot discern the statute's meaning and its application.

Our decision that the Partial–Birth Abortion Ban Act is void for vagueness finds support in this circuit. In *Charles v. Carey*, 627 F.2d 772, 790–91 (7th Cir.1980), the Seventh Circuit held that an abortion statute was void for vagueness because it left terms undefined yet subjected physicians to stiff criminal penalties. The challenged statute expanded the definition of term "individual" in the Illinois Criminal Code to include "any human being aborted alive." Thus, any person who killed an "individual" or a "human being aborted alive" could be guilty of murder under the Illinois Criminal Code. The Seventh Circuit enjoined the statute because it found that the phrase "any human being aborted alive" failed to give fair notice of the conduct that was forbidden. The court explained:

> The meaning of the term "alive" could include only the most minimal of life signs

---

1. The defendants attempt to clarify HB 382 by asserting that the term "birth" as used in "partial-birth abortion" is defined in one medical text as "the process by which a liveborn infant or stillborn infant is expelled or extracted from the mother." It is this scenario that defendants claim the statute proscribes. The statute, however, contains a different definition for the phrase "partial-birth" abortion. As used in HB 382, the term "birth" is part of the phrase "partial-birth abortion", which is defined as "an abortion in which a person … partially vaginally delivers a living human fetus or infant before killing the fetus or infant and completing the delivery." We refuse to read another definition into the statute when the term at issue is already defined within the statute. It is from the definitions within the statute that we draw the statute's meaning.

in a nonviable fetus or it could be limited to the capability of sustained survival. The lack of a precise definition leaves physicians uninformed as to their duties toward the fetus and could deter them from performing abortions for fear of being singled out for prosecution for murder under this ambiguous standard.

627 F.2d at 791. Likewise, in the statute before this court, the term "living" could describe the most minimal life signs in a nonviable fetus, such as having a heartbeat, or it could mean capable of sustained survival. However, the court, and more importantly, the physicians, have no way of knowing whether the legislature intended the statute to apply to the former situation rather than the latter.

District courts in other circuits that have been confronted with similar "partial-birth abortion statutes" have found the language of the statute, or lack thereof, ambiguous and susceptible to more than one interpretation. For example, in *Evans v. Kelley*, 977 F.Supp. 1283 (E.D.Mich.1997), the court declared the partial-birth abortion statute at issue void for vagueness. The statute in *Evans* defined "partial-birth abortion" as an abortion in which the physician "partially vaginally delivers a living fetus before killing the fetus and completing the delivery." Similarly, in *Planned Parenthood of Southern Arizona, Inc. v. Woods*, 982 F.Supp. 1369 (D.Ariz. 1997), the district court held the partial-birth abortion statute unconstitutionally vague because its definition was ambiguous and susceptible to different interpretations. Like HB 382, the Arizona law defined "partial-birth abortion" as a procedure in which a physician "partially vaginally delivers a living fetus."

Because the constitutional rights of women are directly affected by the interpretation of the statute taken by physicians who perform abortion procedures, defendants must meet a higher standard of certainty to avoid a vagueness problem. A higher standard of certainty is also required because criminal penalties are imposed by the statute. Defendants have failed to meet such a standard. The statute, laden with undefined terms, fails to define with any certainty the conduct that is proscribed. Without such definitions to guide persons as to the prohibited conduct, the law "furnishes a convenient tool for 'harsh and discriminatory enforcement by ... prosecuting officials'," *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940)), and gives law enforcement officers, courts and jurors "unfettered freedom" to "engage in arbitrary and discriminatory enforcement." *Id.* As such, the court finds that the statute is void for vagueness. This holding, in turn, renders the entire statute unconstitutional as the remainder of the statute depends upon the vague provisions for its meaning.

## B. Undue Burden

■■■ Plaintiffs also contend that HB 382 is unconstitutional because it imposes an undue burden on the constitutional rights of women seeking abortions. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court reaffirmed the central holding of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a woman has a constitutional right to terminate her pregnancy before viability and the State may not prohibit any woman from making that ultimate decision. The Court also reaffirmed *Roe*'s holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 505 U.S. at 879, 112 S.Ct. at 2821 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. at 732).

The plurality, however, rejected *Roe*'s rigid trimester framework because they believed it undervalued the State's interest in life. Under the trimester framework, almost all abortion regulations were prohibited during the first trimester of pregnancy. During the second trimester, regulations were permitted to protect the woman's health, but not to further the State's interest in potential life. During the third trimester, laws regulating or prohibiting abortion were allowed

provided that the life or health of the mother was not at stake. Instead of this framework, the plurality in *Casey* drew the line at viability and recognized the State's interest in promoting life even in the earliest stages of pregnancy. The Court declared: "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." 505 U.S. at 874, 112 S.Ct. at 2819. In the Court's view, "the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected right." 505 U.S. at 876, 112 S.Ct. at 2820.

The Court clarified that a state regulation imposes an undue burden when it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. 505 U.S. at 877, 112 S.Ct. at 2820. "A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Id.* Moreover, the Court stated that state regulations that promote the health or safety of a woman seeking an abortion are valid, unless they have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion.

Applying these principles, we review the challenged legislation. HB 382 proscribes "partial-birth abortions" except in cases where it is necessary to save the life of the mother because her life is endangered by a physical disorder, a physical illness, or a physical injury, including a life-endangering condition caused by the pregnancy itself, "provided that no other medical procedure would suffice for that purpose." There is no exception to the ban when the woman's health is endangered, when the woman suffers from conditions or illnesses other than those enumerated, such as mental conditions or disorders, or when the woman's health is endangered by the pregnancy itself or is compromised by the alternative abortion procedure. Significantly, the Act does not distinguish between abortions that are performed before viability and after viability.

For two reasons, the court finds that HB 382 imposes an undue burden on a woman's constitutional right to choose to terminate her pregnancy before viability. First, the statute, as written, has the potential effect of banning the most common and safest abortion procedures. It does so without regard for the viability of the fetus. Second, the statute does not permit a physician to use the prohibited procedure when it is necessary to protect the woman's health, whether mental or physical, or when an alternative abortion procedure would compromise the woman's health. As such, HB 382 is clearly unconstitutional.

HB 382 has the potential effect of banning the most common and safest abortion procedures. It prohibits physicians from "knowingly" performing a partial-birth abortion. Although "knowingly" is not defined by the statute, it generally means "consciously" or when a person "acts with awareness of the nature of his conduct." BLACK'S LAW DICTIONARY 872 (6th ed.1990). Thus, a physician acts "knowingly" when she is aware that her conduct may fall within the statute's reach. In virtually every abortion procedure, except hysterotomy and hysterectomy, a physician may "knowingly" violate HB 382. As explained before, in suction curettage, D & E, and induction procedures, a physician is aware that she may deliver a partial "living" fetus or partially deliver an intact fetus. Although the physician does not know in advance whether one of these two scenarios will in fact occur, she will have violated the statute when such a delivery occurs. To ensure that her conduct does not fall within the statute's reach, the physician will probably stop performing such procedures.

The affidavits and declarations submitted by the plaintiff-physicians supports this conclusion. All of the physicians stated in their affidavits and declarations that if HB 382 goes into effect, they and their colleagues will most likely stop performing abortions because they "know" that during any abortion procedure, except hysterotomy and hysterectomy, a part of a "living" fetus may be delivered or an intact fetus may be partially delivered. Although they cannot predict in advance whether this will happen, they will stop performing abortions to avoid criminal

and civil punishment. *See* Ginsberg Aff. ¶ 17 ("a doctor cannot predict whether such a circumstance will arise, but there is always a possibility that it will."); Streicher Aff. ¶ 5; Frederiksen Decl. ¶ 5; Hammond Decl. ¶¶ 27, 28. Dr. Zbaraz states that "[b]ecause physicians cannot predict the precise course of events that will occur in a given abortion procedure," it is his belief that "the mere performance of a procedure deemed after the fact to fall within HB 382's definition" could subject him to criminal penalties. This risk of prosecution "would cause [him] to stop providing abortions." Zbaraz Aff. ¶ 17. Likewise, Dr. Frederiksen states that because "the course of surgery and obstetrical practice is unpredictable," a physician cannot adhere to a rigid plan, but must adapt quickly and proceed in a way that may not have been intended at the outset of the procedure. Frederiksen Decl. ¶ 52. In her opinion, "HB 382 leaves physicians to fear that virtually any abortion could subject them to criminal liability." *Id.* at ¶ 53. Because the standard in HB 382 effectively chills physicians from performing most abortion procedures, the statute is an undue burden on a woman's constitutional right to seek an abortion before viability.

Moreover, physicians who want to continue performing abortion procedures will have to do so at an increased cost or an increased risk to the patient. *See* Streicher Aff. ¶ 5; Frederiksen Decl. ¶ 5. According to Dr. Zbaraz, if physicians stop performing suction curettage, D & E and induction procedures, they will be limited to performing hysterotomies, hysterectomies and induction procedures that ensure the demise of the fetus in utero. Zbaraz Aff. ¶ 21. The mortality rate associated with hysterotomy and hysterectomy is more than ten times that associated with a D & E procedure and more than seven times that associated with instillation abortion. Moreover, the mortality rate of induction procedures is almost twice that of D & E procedures. Serious complications, including fatal heart, liver and kidney problems, can result from performing inductions, hysterotomies and hysterectomies. Hysterectomies also render a woman sterile. Thus, the health risk to women will be significantly higher if D & E and suction curettage procedures are prohibited and only hysterotomy,

hysterectomy, and induction procedures are available.

Further, because these procedures require hospital stays and expensive equipment, the cost of abortion procedures to patients will significantly increase. Ginsberg Aff. ¶ 23. Whereas D & E procedures cost from $350 to $700, inductions and other procedures that require hospital stays cost from $1000 to $3000. Frederiksen Decl. ¶ 54. Such procedures often require expensive ultrasound equipment, costing in excess of $30,000. Because HB 382 will significantly increase the cost of abortion procedures, it places a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. Such an undue burden on her constitutional rights is unconstitutional.

Alternatively, a physician could avoid the reach of HB 382 by assuring the demise of the fetus in utero. To do so, a physician would have to inject the fetus prior to beginning the abortion procedure with a substance to trigger cardiac arrest. Zbaraz Aff. ¶ 23, Ginsberg Aff. ¶ 24. However, only a few physicians are trained to perform such injections and they require the use of highly sophisticated ultrasound machinery. Hammond Decl. ¶ 40; Ginsberg Aff. ¶ 24. These injections are also contraindicated for some women, such as those who have heart conditions. They also carry a risk of puncturing the bowel, veins or arteries. Zbaraz Aff. ¶ 23. A punctured bowel can result in a serious infection and possibly death. Punctured veins or arteries can cause internal bleeding. Another way to ensure fetal demise is to attempt to cut the umbilical cord while the fetus is in utero. Depending on the location of the cord within the uterus, searching for the cord with an instrument or suction tube can cause uterine perforation and other complications. Hammond Decl. ¶ 42. On the other hand, suction curettage and D & E procedures have significantly lowered the risk and improved the overall quality of second trimester abortion procedures. Zbaraz Aff. ¶ 21; Ginsberg Aff. ¶ 21. Hysterotomy, hysterectomy and induction procedures that ensure fetal demise cannot be regarded as effective substitutes for suction curettage and D & E procedures.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 75–79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court found unconstitutional a provision of a Missouri abortion statute that prohibited the use of saline amniocentesis, an abortion procedure used after the first 12 weeks of pregnancy. The appellants in *Danforth* argued that this proscription would effectively preclude abortions after the first trimester because 70% of all abortions performed after the first trimester used the proscribed procedure. Moreover, they stressed that hysterotomy and hysterectomy were significantly more dangerous, and another safer alternative, prostaglandin installation, was not widely used. The Court relied upon these arguments in finding the proscription unconstitutional. The Court stated:

> [T]he State ... would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even the continuation of pregnancy until normal childbirth. Moreover, ... it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

428 U.S. at 78–79, 96 S.Ct. at 2845. The Court found that the ban on the procedure was not "a reasonable regulation for the protection of maternal health." Rather, it was "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks." *Id.* The Court, therefore, held that the ban on the procedure was unconstitutional. *See also Wynn v. Scott*, 449 F.Supp. 1302, 1325–26 (N.D.Ill. 1978) (finding a statute's proscription of an abortion procedure unconstitutional where alternative procedures available were not as safe and were contraindicated for certain women), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir.1979).

Other circuit and district courts that have reviewed similar partial-birth abortion statutes have found that the effect of such statutes would be to prevent many women from obtaining safe abortions. *See, e.g., Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir.1997); *Evans v. Kelley*, 977 F.Supp. 1283 (E.D.Mich.1997); *Planned Parenthood of Southern Arizona, Inc. v. Woods*, 982 F.Supp. 1369 (D.Ariz.1997); *Carhart v. Stenberg*, 972 F.Supp. 507 (D.Neb.1997). Under *Carey* and *Danforth*, this effect is unconstitutional and renders the statute invalid. Because HB 382 has the effect of inhibiting the vast majority of abortion procedures and would significantly increase the health risks for a woman seeking an abortion of a nonviable fetus, the court finds the statute unconstitutional.

Defendants contend that there are applications of HB 382 that would unquestionably be constitutional. For example, they argue that a physician who aborts a viable, full-term, partially-born child for no compelling reason relating to maternal health would be subject to prosecution under the statute. Under these circumstances, they claim that the statute would operate constitutionally. Defendants ask that we apply the standard set forth in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), which was decided five years before the Supreme Court's decision in *Casey*. Under *Salerno*, to make a facial challenge to a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* The fact that the statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*

It appears, however, that the plurality in *Casey* abandoned the *Salerno* rule in cases dealing with abortion. The plurality in *Casey* rejected the State's argument that although the spousal consent provision at issue imposed a burden on some women, it imposed almost no burden on the vast majority of women seeking abortions. 505 U.S. at 894, 112 S.Ct. at 2829. Circumstances, therefore, existed where the statute operated within constitutional bounds. In rejecting this argument, the plurality stated:

> The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose con-

duct it affects..... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.

*Id.* Because the statute would impose an undue burden on the small percentage of married women who did not want to tell their husbands about the abortion, the plurality held that the statute was invalid and unconstitutional.

It should be noted that Chief Justice Rehnquist acknowledged the plurality's decision to forego application of the *Salerno* rule in his dissent, joined by Justice White, Justice Scalia and Justice Thomas. The Chief Justice stated that it was not enough for the petitioners to show that in some cases the spousal consent provision would operate in an unconstitutional manner. Instead, under *Salerno,* "they must 'show that no set of circumstances exists under which the [provision] would be valid.'" 505 U.S. at 973, 112 S.Ct. at 2870 (Rehnquist, C.J., dissenting) (citations omitted). The Chief Justice went on to say that the plurality "appears to ignore this point in concluding that the spousal notice provision imposes an undue burden ....". 505 U.S. at 973 n. 2, 112 S.Ct. at 2870 n. 2.

We are bound to follow the plurality's decision and must apply the undue burden standard as set out in *Casey.* Applying *Casey,* the proper focus for our inquiry is the group for whom the law is a restriction, namely the vast majority of women who seek abortions of a nonviable fetus. Defendants would have us focus on the group for whom the law is irrelevant, *i.e.* those who seek abortion of a viable fetus. The law is irrelevant for such a group because Illinois already proscribes abortions after viability when health concerns are not at issue. *See* 720 ILCS 510/5. It would be totally superfluous for the Illinois legislature to pass a statute that applied only to women seeking abortions of a viable fetus when another statute already covers such circumstances. Instead, it is clear that the Illinois legislature passed a statute that was meant to proscribe much broader conduct. The statute, as written, cannot withstand constitutional scrutiny.

Even if the court found that there are alternative procedures available to women seeking abortions of a nonviable fetus, the statute would nevertheless be invalid because it does not provide an exception to the ban when the woman's health, whether it be mental or physical health, is endangered, or when the alternative procedure would compromise her health. This failure to include a health exception also renders the statute unconstitutional. Without a health exception, the statute places a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. *See Casey,* 505 U.S. at 878, 112 S.Ct. at 2821.

A woman seeks an abortion for many reasons, including the fact that a pregnancy may compromise her health or subject her to serious medical problems. Medical and surgical illnesses, whether caused by the pregnancy or pre-existing but complicated by the pregnancy, may necessitate that the physician advise the woman to consider an abortion. Frederiksen Aff. ¶ 15. These illnesses and conditions include: anemia and other diseases of blood, urinary tract infections and disease, acute renal failure, heart disease, endocrine disorders, diseases of the nervous system, liver diseases, connective tissue disorders such as lupus erythematosus and rheumatoid arthritis, and HIV. Some of these illnesses and disorders can be exacerbated by the pregnancy and become more painful due to the pregnancy. Pregnancy and the process of delivering a baby may prove fatal to a woman with a serious illness or disease. *Id.* In these circumstances, a woman may want an abortion before the fetus becomes viable.

If, however, HB 382 went into effect, women could not have "partial-birth abortions" when only their health is in danger. Instead, they would have to undergo either hysterotomy, hysterectomy, and inductions in which fetal demise is ensured, unless one of these procedures puts their lives at risk. As stated before, these procedures entail significant health risks, even as much of a risk as the pregnancy itself presents. A woman would be forced to make an untenable choice between either undergoing a risky abortion procedure or continuing her pregnancy in the face of unknown risks and health concerns. Further, the statute does not permit a physician to use the banned procedure when the alternative procedures endanger the patient's

health or exacerbate her existing health conditions. The statute forces the physician to advise her patient in a manner that may be contrary to the patient's best interests. Such an interference into the rights of women seeking abortions is unacceptable under *Casey.* Before viability, a woman has a constitutional right "to choose to have an abortion and to obtain it without undue interference from the State." *Casey,* 505 U.S. at 846, 112 S.Ct. at 2803. Even subsequent to viability, *Casey* reaffirmed that "the State ... may ... regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgement, for the preservation of the ... health of the mother." 505 U.S. at 879, 112 S.Ct. at 2821 (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. at 732). Without a health exception, HB 382 is unconstitutional.

The lack of a health exception in HB 382 also indicates that the Illinois legislature intended to "trade-off" the woman's health for fetal survival. That is, the statute only permits abortion procedures that are extremely risky to the woman and prohibits the safer alternatives, unless her life is in danger. The purpose and effect of such a statute is to force women to carry their fetuses to full-term. Such a trade-off between a woman's health and fetal survival was held unconstitutional in *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 768–69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled in part on other grounds, Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674, and in *Colautti,* 439 U.S. at 400, 99 S.Ct. at 688. Because HB 382 requires women to remain pregnant even in the face of serious health concerns, it operates as a substantial obstacle to women seeking abortions. As such, it is unconstitutional.

### C. Third–Party Consent

█ HB 382 also provides a civil action to the parents of a minor against a physician who performs a "partial-birth" abortion on the minor, unless the parents consented to the procedure or the pregnancy resulted from the parent's criminal conduct. The plaintiffs contend that this provision is unconstitutional under *Casey* because it requires a physician to obtain parental consent in almost all cases where a minor is pregnant and does not provide a confidential and expeditious judicial bypass procedure. The defendants respond that the statute does not attempt to evade constitutional requirements relating to consent bypass procedures. Instead, they argue that the consent requirement solely applies to the specific banned procedure, which if performed is a felony.

We reject the defendants' reading of the statute. The statute effectively requires a physician to obtain parental consent before performing almost every abortion procedure, except for hysterotomies and hysterectomies. In *Casey,* the Court reaffirmed that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, "provided that there is an adequate judicial bypass procedure." 505 U.S. at 899, 112 S.Ct. at 2832. Because HB 382 does not provide a judicial bypass procedure, the consent provision is unconstitutional.

### D. Irreparable Harm, Public Interest, Balance of Hardships

Plaintiffs have shown actual success on the merits of their claims. They have established that HB 382 is unconstitutionally vague and unduly burdensome on a woman's constitutional right to an abortion, and contains impermissible third-party consent requirements that violate the rights of minors seeking abortion services. In turn, this court has declared the statute invalid and unconstitutional. Because the statute infringes on the constitutional rights of women, plaintiffs have also shown that they and their patients would suffer irreparable harm if the court permitted the statute to go into effect. Likewise, the public interest is served by our determination that the statute is unconstitutional because, in so doing, we protect the constitutional rights of those who are affected by the statute. Finally, the balance of hardships in this case favors the plaintiffs. The protection of constitutional rights clearly outweighs any interest the State may have in promoting the interests of the fetus with a statute that is unconstitutional. Accordingly, we grant the plaintiffs' motion for a preliminary and permanent injunction.

## VI. CONCLUSION

The Partial–Birth Abortion Ban Act is unconstitutionally vague in that it fails to give fair notice of the conduct that is prohibited. Moreover, HB 382 is unconstitutional because it has the purpose and effect of placing a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. It does so in two respects. First, HB 382 prohibits the safest and most common abortion procedures. As such, it places an undue burden on women seeking an abortion. Second, HB 382 makes no exception for circumstances in which the woman's health is at issue. The failure to provide an exception to the statute when the woman's health is compromised renders the statute unconstitutional. Finally, HB 382 creates third-party consent requirements, without providing a judicial bypass procedure. The failure to include a judicial bypass procedure in the statute renders that provision unconstitutional. Accordingly, the court grants the plaintiffs' motion for a preliminary and permanent injunction.