**A CHOICE FOR WOMEN,**
**et al., Plaintiffs,**

v.

**Robert A BUTTERWORTH,**
**et al., Defendants.**

**No. 98–0774–CIV.**

United States District Court,
S.D. Florida.

Dec. 2, 1998.

Charlene Miller Carres, Tallahassee, FL, Louis M. Silber, Lewis Vegosen Rosenbach & Silber, West Palm Beach, FL, Janet Benshoof, New York City, Bebe J. Anderson, New York City, Marshall Joel Osofsky, Lewis Vegosen Rosenbach & Silber, West Palm Beach, FL, Priscilla J. Smith, New York City, for A Choice for Women, Edward R. Watson, Presidential Women's Center, Michael Benjamin, James Pendergraft, Orlando Women's Center, Women's Health Center in Orlando, Womens's Health Center in Daytona Beach, Ralph Bundy, North American Women's Health & Counseling Services, Inc, Feminist Women's Health Center in Tallahassee.

Eve C. Gartner, New York City, Charlene Miller Carres, Louis M. Silber, Janet Benshoof, Bebe J. Anderson, Marshall Joel Osofsky, Priscilla J. Smith, Center for Reproductive Law & Policy, New York, NY, for Florida Association for Planned Parenthood Affiliates, Inc.

Charlene Miller Carres, Louis M. Silber, Janet Benshoof, Bebe J. Anderson, Marshall Joel Osofsky, Priscilla J. Smith, Center for Reproductive Law & Policy, New York, NY, for Bella Doe, National Women's Political Caucus of Florida, Florida Women's Consortium, on behalf of themselves, their staffs, and their patients.

Kathleen Marie Burgener, Office of the Attorney General, Fort Lauderdale, FL, for Robert A. Butterworth, Katherine Fernandez Rundle.

Andrew Harris Kayton, American Civil Liberties Union Foundation, Miami, FL, for American Civil Liberties Union of Florida, Incorporated.

## AMENDED MEMORANDUM OPINION

GRAHAM, District Judge.

**THIS CAUSE** comes before the Court upon the Plaintiffs' Motion for a Temporary Restraining Order or for Permanent Injunction, (D.E.# 24), filed June 24, 1998.

Plaintiffs sought declaratory and injunctive relief from this Court to prevent HB 1227, the Partial–Birth Abortion Ban Act ("the Act"), from taking effect on June 30, 1998. On June 30, 1998, this Court entered a Temporary Restraining Order that enjoined HB 1227 from taking effect pending a hearing on Plaintiff's Motion for Preliminary Injunction. On August 13 and 14, this Court heard argument on the Plaintiff's Motion for Permanent Injunction.

## I. BACKGROUND

"Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even at its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code. The underlying constitutional issue is whether the State can resolve these philosophic questions in such a definitive way that a woman lacks all choice in the matter, except perhaps in those rare circumstances in which the pregnancy is itself a danger to her own life or health, or is the result of rape or incest."

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 849, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992).

This Court is bound by precedent and must strike down the Partial–Birth Abortion Ban Act because it has the unconstitutional purpose and effect of placing a substantial obstacle in the path of women seeking an abortion prior to the fetus attaining viability.[1] The Court GRANTS Plaintiffs' Motion for a Permanent Injunction.

Plaintiffs—medical facilities, doctors, and political groups suing on behalf of themselves, their staff, and others—bring this civil rights action against Defendants—Attorney General of Florida, Robert A. Butterworth, and State Attorney for Florida's Eleventh Judicial Circuit, Katherine Fernandez Rundle, in their official capacities—in order to challenge the constitutionality of Florida House Bill 1227 ("HB 1227"), as enacted by the Florida Legislature.[2]

---

**1.** "Viability is reached when, in the judgment of the attending physician, on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb ... [T]his point may differ with each pregnancy ..." *Colautti v. Frank-*

*lin*, 439 U.S. 379, 388–89, 99 S.Ct. 675, 682, 58 L.Ed.2d 596 (1979).

**2.** Specifically, the Act amends Florida's Statutes governing abortion by renumbering and amending Florida Statutes § 390.001 (as

## A. Contentions of the Parties

Plaintiffs contend that the Act violates a woman's right to privacy and bodily integrity by restricting her choice of abortion method and by preventing her from determining the course of her own medical treatment. Plaintiffs further contend that the Act violates the Due Process Clause of the United States Constitution because the Act's broad provisions fail to give physicians adequate notice of which medical procedures are prohibited. In addition, Plaintiffs claim that the Equal Protection Clause of the United States Constitution is violated because it prevents only women from choosing medically appropriate health care treatment without legitimate justification, thus discriminating against women on the basis of sex. As a result, the Plaintiffs claim that the Act violates the Plaintiffs and their patients right to privacy, liberty, life, due process, and equal protection guaranteed under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

The State counters that the Act is a reasonable regulation on a specific type of abortion procedure, the intact dilation and extraction ("intact D & X" or "D & X"). The Defendants contend that the Act does not place an undue burden on a woman's right to choose to terminate her pregnancy because it does not ban most other safe abortion procedures. The State also contends that the Act is not unconstitutionally vague because the only way that a physician can be held criminally liable is if he knowingly performs the partial birth abortion.

## B. Summary of the Act

The Act prohibits physicians from "knowingly perform[ing] a partial-birth abortion." FLA.STAT. § 390.0111(5)(a). A "partial-birth abortion" is defined as the "termination of a pregnancy in which the

physician performing the termination of pregnancy partially vaginally delivers a living fetus before killing the fetus and completing the delivery." FLA.STAT. § 390.011(5).

Violation of the Act carries both criminal and civil penalties. Under the Act "any person who willfully performs, or actively participates in" a partial-birth abortion commits a felony in the third degree. FLA.STAT. § 390.0111(10)(a). The Act excepts from its criminal prohibition only those "partial-birth abortions" that are "necessary to save the life of a mother whose life is endangered by a physical disorder, illness, or injury, provided that no other medical procedure would suffice for that purpose." FLA.STAT. § 390.0111(5)(c). Further, the Act creates a civil cause of action for the father of the fetus and for the maternal grandparents of the fetus if the mother is a minor. FLA. STAT. § 390.0111(11)(a). The relief that can be obtained in such a civil action includes monetary damages for "all injuries, psychological and physical" and "damages equal to three times the cost of the partial-birth abortion." FLA.STAT. § 390.0111(11)(b). Finally, FLA.STAT. § 390.0111(5)(b) of the Act provides that "a woman upon whom a partial-birth abortion is performed" cannot be prosecuted for a conspiracy to violate the partial-birth abortion ban but the Act does not exempt the woman from civil liability. FLA. STAT. § 390.0111(11).

## II. ABORTION PROCEDURES

The Centers for Disease Control and Prevention ("CDC") defines an abortion as "a procedure intended to terminate a suspected or known intrauterine pregnancy and to produce a nonviable fetus at any gestational age." Centers for Disease Control, *Abortion Surveillance* (1981) At-

§ 390.0111), renumbering Florida Statutes § 390.002 (as § 390.0112), and amending Florida Statutes § 390.011 as renumbered by the Act, §§ 390.0111(5), 390.0111(11), and

390.011(5) of the Florida Statutes deal .with the prohibition of the performance of "partial-birth" abortions.

lanta, Ga. Centers for Disease Control (1985).

The procedure used to perform an abortion generally varies depending on the gestational age of the fetus which is usually measured as the number of weeks since the first day of the last menstrual period ("LMP").

### A. First–Trimester Procedures

#### 1. Suction, Dilation and Curettage

In the United States the suction or sharp curettage method is the most common procedure used to perform an abortion in the first-trimester. It is used in ninety-one percent of the abortions performed in the State of Florida. In this procedure a physician uses a cannula which is attached to a tube that is attached to a vacuum generator. The physician inserts the cannula through the vagina and into the uterus and removes the fetus through the cannula and attached tube and deposits it in a receptacle. During the procedure, the fetus may travel through the suction tube intact or it may be dismembered. It is possible that in performing this procedure part of the fetus could remain in the uterus and continue to have a heartbeat.

### B. Second and Third–Trimester Procedures

After the first-trimester, many women cite personal health problems, possible fetal health problems, or rape or incest as reasons for terminating their pregnancy. (Plaintiff's Exhibit 7, at 6). Medical reasons can include conditions that existed prior to the pregnancy, conditions that occurred during the pregnancy, or conditions that resulted from the pregnancy itself.[3] *Id.*

Another reason that many women decide to terminate a pregnancy in the second and third-trimester is that some serious fetal anomalies are not diagnosed until the second-trimester. *Id.* Amniocentesis is usually performed between the 14th and 18th weeks of the pregnancy and the results are usually not available for another two to three weeks (Tr. I.46:3–25, 47:1–7). Chorionic villus sampling ("CVS") can be performed earlier, however, it is considered to present a slightly higher risk of miscarriage and/or injury to the fetus.

#### 1. Dilation & Evacuation ("D & E")

Dilation and evacuation procedures are usually performed early in the second-trimester. The D & E procedure is similar to a suction, dilation and curettage except that the physician begins by dilating the cervix over a period of hours with multiple intracervical osmotic dilators to dilate the cervix more widely. Instruments are inserted through the cervix into the uterus to remove fetal and placental tissue. When performing this procedure, the fetus is often not removed intact.

By the 16th to 24th week of gestation, the physician will use laminaria or osmotic dilators in order to dilate the cervix. Fetal tissue is extracted through the use of surgical instruments, which is followed by extraction of placental tissue and subsequent suction curettage. At this stage dismemberment or other procedures may be required (procedures that are not generally required at an earlier stage) because the fetus is larger and the bones are more rigid.

As the district court in *Hope Clinic v. Ryan* noted:

> "The D & E procedures are particularly important for women whose fetuses have genetic or congenital anomalies. Some anomalies are fatal within days, or even

---

**3.** Medical and surgical illnesses that may necessitate that a physician advise a woman to consider an abortion to protect her health include: anemia, pulmonary dysfunction, urinary tract infections, acute renal failure, ec-

lampsia, heart disease, endocrine disorders, diseases of the nervous system, liver diseases, connective tissue disorders, respiratory disease, placenta previa, and HIV. (Tr. I.121–126).

minutes, of birth. Because most fetal anomalies cannot be detected before the Sixteenth to eighteen week LMP, and the results of these tests do not come back until two to four weeks after the test was taken, the D & E procedures are *extremely important* because they can be used to terminate these pregnancies safely. Another advantage of the D & E procedures is that they entail lower rates of maternal health complications, including fever, endometritis, retained products of conception, hemorrhage, and cervical injury. The safety of the D & E depends upon the skill and training of the physician because the procedure involves the use of sharp instruments inside the uterus."

995 F.Supp. 847 (N.D.Ill.1998) (emphasis added).

### 2. Intact Dilation & Extraction ("D & X")

In order to prevent uterine or cervical perforation, physicians have used a variation of the D & E procedure that is sometimes referred to as intact dilation and extraction. The American College of Obstetricians and Gynecologists ("ACOG") describes the procedure as containing all of the following procedures:

1. Deliberate dilation of the cervix, usually over a sequence of days;

2. Instrumental conversion of the fetus to a footling breech;

3. Breech extraction of the body excepting the head; and

4. Partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

ACOG Statement on Intact Dilation and Extraction, dated Jan. 12, 1997.

ACOG convened a select panel that could "identify no circumstances under which [an intact D & X] procedure, as defined above, would be the only option to save the life or preserve the health of the woman." *Id.* The ACOG panel found, however, that an intact D & X "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman, and only the doctor, in consultation with the patient, based on the woman's particular circumstances can make this decision." *Id.*

The intact D & X is particularly useful in cases of hydrocephaly or other fetal abnormalities incompatible with life outside the womb because geneticists often request that the fetus be removed intact to facilitate genetic testing. *Hope Clinic,* 995 F.Supp. at 852. The intact D & X reduces the risk of uterine or cervical perforation. *Id.*

### 3. Labor Induction Techniques

Labor induction techniques are performed primarily in the second and third-trimester. Labor induction techniques may be subdivided into subgroups based on the type of abortifacient used (hypertonic solutions such as urea or saline), and prostaglandin inductions. (Plaintiff's Exhibit 7, at 9) (Citing D.A. Grimes and K.F. Schulz, *Morbidity and Mortality from Second–Trimester Abortions.* 30 J.Reprod.Med. 505–514 (1985); W.M. Hern, *Laminaria Versus Dilapan Osmotic Cervical Dilators for Outpatient Dilation and Evacuation Abortion: Randomized Cohort Comparison of 1001 Patients,* 171 Am.J.Ob.Gyn. 1324–28 (1994)). The physician may use hypertonic solutions in labor induction procedures to produce fetal death and labor then usually follows. *Id.* In saline and urea abortions, the physician inserts a needle through the abdomen and the amniotic sac is injected with a concentrated salt or urea solution. This induces fetal contractions and results in fetal demise. *Id.*

### 4. Hysterotomy and Hysterectomy

Both D & E and labor induction procedures are superior procedures than either hysterotomy or hysterectomy. Hysterotomy is no longer a generally accepted method of abortion. (Tr. I.78:24–25, 79:1–14).

The mortality rate associated with hysterectomy and hysterotomy is more than seven times that associated with labor induction techniques, and more than ten times that associated with D & E procedures. *Id.* (citing Lawson et al., *Abortion Mortality, United States, 1972 Through 1987,* 171 Am.J.Ob.Gyn. 1367 (Table II); D.A. Grimes and K.F. Schulz, *Morbidity and Mortality from Second–Trimester Abortions* 30 J.Repr.Med. at 509).

### III. STANDARD OF REVIEW

■ Plaintiffs seek a permanent injunction from this Court to prevent Defendants from enforcing HB 1227, the Partial–Birth Abortion Act. When seeking a permanent injunction, the moving party must meet the same four factor test required on a motion for a temporary restraining order except that in seeking a permanent injunction a plaintiff must prove actual success on the merits rather than a likelihood of success on the merits. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995); *United States v. Metropolitan Dade Cty. Fla.,* 815 F.Supp. 1475, 1477 (S.D.Fla.1993). The moving party must demonstrate:

(1) actual success on the merits;

(2) that the permanent injunction is necessary to prevent irreparable injury;

(3) that the threatened injury outweighs the harm the permanent injunction would inflict on the non-movant; and

(4) that the permanent injunction would serve the public interest.

*Amoco,* 480 U.S., at 546 n. 12, 107 S.Ct., at 1404 n. 12.

### IV. DISCUSSION

As stated above, Plaintiffs must show actual success on the merits of their claim that HB 1227 is unconstitutional. Plaintiffs contend that the Act is unconstitutional because: (1) it has the effect of putting a substantial obstacle in the path of women seeking abortions in Florida; (2) it does not contain a health exception; and (3) it is void for vagueness.

### A. Undue Burden Standard

■ Plaintiffs contend that HB 1227 is unconstitutional because it has the effect of putting a substantial obstacle in the path of women seeking abortions in the State of Florida. In *Casey,* a plurality of the Supreme Court rejected the rigid trimester framework of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and held that a State has a profound interest in potential life. The plurality held that the State may take measures throughout the pregnancy that ensure that a woman's choice to terminate her pregnancy is informed. 505 U.S., at 878, 112 S.Ct., at 2821. However, these measures are only constitutional if they are intended to persuade a woman to choose childbirth over abortion rather than to burden a woman's substantive right to abortion. A majority of the Court held that the State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. 505 U.S., at 845, 112 S.Ct., at 2803. The Court also reaffirmed *Roe's* holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe v. Wade,* 410 U.S., at 164–65, 93 S.Ct., at 732.

The Court adopted the undue burden standard and described it as follows:

A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering

the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

505 U.S., at 876, 112 S.Ct., at 2820.

Defendants contend that the Act does not place an undue burden on women seeking an abortion because it is narrowly tailored to proscribe only the intact D & X procedure. However, FLA.STAT. § 390.011(5)(a) of the Act is not narrowly tailored. It bans "partial-birth abortions" at all stages of pregnancy except where it is "necessary to save the life of the mother." FLA.STAT. § 390.011(5). The Act proscribes procedures in which "the physician performing the termination of pregnancy partially vaginally delivers a living fetus before killing the fetus and completing the delivery." FLA.STAT. § 390.011(5). As noted above, the D & X procedure involves the four elements set forth in the ACOG statement of policy.

If the Florida legislature had intended to prohibit only the intact D & X procedure they could have easily done so by incorporating the language set forth in the ACOG statement of policy. The Act's definition of "partial-birth abortion," however, is extremely broad. It does not require that the fetus be instrumentally converted to a footling breach position. Nor does the Act require the breech extraction of the entire fetal body except the head. A plain reading of the Act demonstrates that the fetus need not be intact at the time of the "partial[ ] vaginal delivery." The Act does not specifically contain any of the elements set forth in the ACOG statement of policy. Thus, the Court finds that the Act is not narrowly tailored to prohibit only intact D & X procedures. Even if the Court construes the Act to apply only to intact D & X procedures, the Act is unconstitutional because it imposes an undue burden on a woman's right to an intact D & X procedure on a nonviable fetus.

In drafting this Act, it appears that the Florida legislature intentionally chose broad and amorphous language. The Act requires only that: (1) the physician perform a partial vaginal delivery; (2) the fetus be "living" when the partial vaginal delivery begins; and (3) the physician kill the fetus after the "partial vaginal delivery." This definition appears calculated to include the D & E procedure, the D & X procedure, and the labor induction procedures. During the D & E procedure, the physician regularly and intentionally delivers an attached or severed fetal limb into the vagina. The fetus may have vital signs at this point. In the labor induction procedure, the physician draws the fetus into the vagina, most often beginning with the feet or head. The fetus may have vital signs at this point.

Therefore, in these procedures, the fetus may be and often is "living" when the vaginal delivery begins. The physician may consider that the fetus is "living" because he has previously heard a fetal heartbeat and nothing has yet occurred to cause fetal demise. Ultimately, in these procedures, the actions that the physician takes to complete the procedure will kill the fetus. Accordingly, the D & E, the D & X, and the labor induction procedures fall within the scope of the Act.

The State contends that the Act does not place an undue burden on women because the above abortion procedures are not prohibited if prior to delivery the physician causes fetal demise in utero with an intracardiac injection of potassium chloride. Intracardiac injection, especially in the early gestational ages, increases the risk to a woman's life or health. (Tr. I:208, 4–25, 209:1–5) This procedure does not advance any interest that the State has in the life of the fetus. The Court finds that requiring a physician to perform an intracardiac injection prior to performing an abortion procedure places an undue burden on a woman's right to a safe abortion.

In summary, the Act is unconstitutional because it places an undue burden on a woman seeking a D & E procedure, a labor induction procedure, or a D & X procedure prior to viability of the fetus.

### B. Life or Health of the Mother

■ Plaintiffs contend that the Act is unconstitutional because it fails to contain a health exception. Even subsequent to viability, a State may not interfere with a women's choice to decide which procedure is most appropriate to save her life or health. *Roe*, 410 U.S., at 164, 93 S.Ct., at 732; *See also Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784; *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990) (State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims).

Florida may not place its interest in fetal life above its interest in the life or health of a woman at any time during the course of a pregnancy. Under *Casey*, the plurality held that "subsequent to viability, the State of Florida may choose to regulate or even proscribe abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 505 U.S., at 878, 112 S.Ct., at 2821, (citing *Roe*, 410 U.S., at 164–165, 93 S.Ct., at 732).

Under both *Casey* and *Roe*, the State "may not proscribe a particular abortion procedure, even post-viability, if it is the most appropriate procedure in a particular circumstance to save the life or health of a woman." *Casey*, 505 U.S., at 878, 112 S.Ct., at 2820; *Roe*, 410 U.S., at 163–64, 93 S.Ct., at 732. The ACOG statement of policy states that the intact D & X "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman."

In *Casey*, a majority of the Court found that "the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continu-

ing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S., at 878, 112 S.Ct., at 2821, (citing *Roe*, 410 U.S., at 164, 93 S.Ct., at 732). The Supreme Court affirmed the Third Circuit's construction of the medical emergency exception as ensuring that compliance with its abortion regulations must not "in any way pose a significant threat to the life or health of a woman." *Id.* 505 U.S., at 879, 112 S.Ct., at 2821 (citing *Roe*, 410 U.S., at 164–65, 93 S.Ct., at 732). In *Casey*, the Third Circuit found that the emergency exception covered all serious conditions including preeclampsia, inevitable abortion, and premature ruptured membranes. *Planned Parenthood v. Casey*, 947 F.2d 682, 700–01 (3rd Cir.1991). The Act's medical emergency exception must be drafted broadly to protect the woman's life and health.

Any statute that prohibits a woman, in consultation with a physician, from making the ultimate decision regarding which medical procedure is most appropriate under the circumstances to save her life or health would constitute an undue burden. *Casey*, 505 U.S., at 878, 112 S.Ct., at 2821, (citing *Roe*, 410 U.S., at 164–165, 93 S.Ct., at 732). Here, the only medical exception to the Act is where a "partial-birth abortion ... is necessary to save the life of a mother whose life is endangered by a physical disorder, illness, or injury, provided that no other medical procedure would suffice for that purpose." FLA.STAT. § 390.011(5)(c).

■ The Act poses a significant threat to the life and health of a woman because the Act contains no health exception and only a qualified life exception. The State contends that the language in subsection 4, which sets forth the medical standard to be used post-viability, prevents the Act from imposing a significant threat to the life and health of a woman. Subsection 4 states that "the woman's life and health shall constitute an overriding and superior consideration to the concern for the life

and health of the fetus." Defendants' contention is incorrect because subsection 4 would conflict with subsection 5.[4]

Under FLA.STAT. § 390.011(5)(c), the life exception allows a "partial-birth abortion" only where "no other medical procedure would suffice for that purpose." During the post-viability stage, the Act constitutes an undue burden on a woman's right to obtain a safe abortion because the Act would force her to undergo a procedure that is potentially more dangerous to her health than the method that the Act proscribes.

### C. Vagueness

■ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Courts insist that a statute be precise enough to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." 408 U.S., at 108, 92 S.Ct., at 2298. A law is deemed unconstitutionally vague if it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." 408 U.S., at 108–09, 92 S.Ct., at 2299.

■ If a statute imposes criminal penalties or infringes on constitutional rights then due process requires a heightened standard. *Colautti*, 439 U.S., at 391, 99 S.Ct., at 683. These principles of judicial review are in counterpoise to the electoral and legislative process that has wrought the statute in question.

■ The Plaintiffs contend that the ambiguous nature of the Act will inhibit abortion providers from providing the safest and most common abortion procedures, or force them to use additional or riskier procedures to ensure compliance with the Act. HB 1227 defines a "partial-birth abortion" as a termination of pregnancy in which the physician performing the termination of pregnancy partially vaginally delivers a living fetus before killing the fetus and completing the delivery. FLA.STAT. § 390.011(5). The Act contains no definitions for the terms "partially vaginally deliver" and "living fetus."

Several courts have held that an identical or substantially similar definition of the term "partial-birth abortion" was unconstitutionally vague because the terms "partially vaginally deliver," and "living fetus" were not defined. This is because these terms hold a broader meaning in the medical community than in society at-large. *Planned Parenthood of Southern Arizona v. Woods*, 982 F.Supp. 1369, 1378 (D.Ariz. 1997) (Arizona law held unconstitutionally vague because physicians performing abortions were not given "fair warning under the statute as to what conduct is permitted and as to what conduct will expose them to criminal and civil liability"); *Hope Clinic*, 995 F.Supp. at 854–56 (Illinois law held unconstitutionally vague because it did not define terms necessary to guide physicians in their behavior); *Carhart v. Stenberg*, 11 F.Supp.2d 1134 (D.Neb.1998) (Nebraska Act held unconstitutionally vague even though the Act clarified the term "partially vaginally delivers").

The phrase "partially vaginally delivers" is subject to more than one interpretation. *Hope Clinic*, 995 F.Supp. at 854–55. The term "delivery" is given a very broad meaning in obstetrics. (Tr. II.11–14).

---

**4.** It is a fundamental principle of statutory construction that, as between two possible interpretations, the Court must give the statute the interpretation that is logical and consistent with the statute as a whole. 2A Sands, *Sutherland Statutory Construction* § 45.12 (5th ed. 1992) Under the State's interpreta-tion, the Act would permit "a partial-birth abortion" to be performed on a viable fetus to preserve the life and health of the woman; however, if the fetus is non-viable a "partial-birth abortion" could only be performed to save the woman's life. This construction is illogical.

Anything that is removed from the uterus, whether it is a fetus, a fetal part, or a baby, is considered to be "delivered." *Id.* Thus, in all abortion procedures, except hysterotomy and hysterectomy, a fetus or a fetal part is "delivered." *Hope Clinic,* 995 F.Supp. at 854. Physicians define the term "living" as having a heartbeat. (TR. I.59:6–8). Given the broad definition of the term "delivery," a physician would consider any procedure a "partial-birth abortion" if during the course of the procedure a fetal part is delivered while the remaining part continues to have a heartbeat. Accordingly, the Act's language is broad enough to cover the D & E procedures, the labor induction procedures, and the intact D & X procedures.

The record indicates a great deal of uncertainty among the members of the medical community regarding which procedures are prohibited by the Act. This lack of clarity is demonstrated by the disagreement among the Plaintiffs' and the Defendants' expert witnesses over which procedures are covered. Plaintiffs' expert, Dr. Watson, testified that a D & X procedure contains most of the four elements set forth in the ACOG statement of policy and would be banned by the Act. He does not believe that the fetus must be alive at the time that the procedure is performed. (Tr. I.95:21–25, 96:1–2). Defendants' expert, Dr. Di Giacomo, testified that the D & X procedure includes all of the elements set forth in the ACOG statement of policy and would not be banned by the Act. (Tr. II.123:15–19). Moreover, Dr. Di Giacomo draws a distinction between situations where the physician decompresses the head to remove the fetus when the fetus' head accidentally becomes stuck in the cervix and situations where the physician intends for the head to become stuck. (Tr. II.125:4–25, 126:1–2) Dr. Di Giacomo believes that the Act bans the latter situation only. He believes that the Act only prohibits a physician from knowingly and intentionally performing an intact D & X or a variation of a D & X. (Tr. II.144:10–25, 145:1–14). Dr. Benjamin believes that the

language in the Act is broad enough to cover the suction, dilation and curettage procedures, the D & E procedures, the labor induction procedures, and the intact D & X procedures. (Tr. II.32–35).

The broad language contained in the Act serves only to heighten the confusion. The legislature's choice of broad terminology fails to give physicians adequate notice of which medical procedures are prohibited. Moreover, the Act must meet a higher standard of certainty because it directly effects a woman's constitutional right to an abortion and imposes criminal penalties. The Act fails to meet this higher standard.

The Court finds that HB 1227 is unconstitutional because it poses a threat to a woman's right to choose to have an abortion prior to the viability of the fetus. The Act is void for vagueness because it fails to define the conduct it prohibits with the required degree of certainty. As a result, the Court finds that the Plaintiffs have proved actual success on the merits of their claim. *See Casey,* 505 U.S., at 833, 112 S.Ct., at 2791.

### 2. Irreparable Injury

 This statute endangers the health of women who might seek abortions and deprives them of their constitutional right to an abortion prior to the viability of the fetus. *See Casey,* 505 U.S., at 833, 112 S.Ct., at 2791. Accordingly, HB 1227 deprives women from exercising their constitutional right to choice. Further, the Act threatens women with irreparable injury because they may be denied appropriate medical care either because doctors will not treat them or doctors will be forced to use more dangerous abortion procedures.

The Act further threatens physicians and clinics who offer abortions with irreparable injury. Doctors and clinics who perform abortions may be threatened with felony prosecution. Therefore, the Court finds that Plaintiffs have demonstrated irreparable injury.

### 3. Threatened Injury Outweighs Harm To Non–Movant

The Court finds that issuing a permanent injunction would cause no damage to the Defendants in this case. Florida's other statutes relating to the provision of abortions, including its ban on almost all abortions after the third-trimester, will remain in effect. The harm to women, on the other hand, is a substantial denial of their right to an abortion pre-viability. Further, the Act will leave doctors and clinics who perform abortions open to serious sanctions for violations of HB 1227.

### 4. Public Interest

This Court finds that issuing a permanent injunction does not adversely affect the public interest because the public interest is well served when the Court protects the constitutional rights of the public; in this case, the constitutionally protected right of women to have abortions before the fetus becomes viable, and the right to a medical emergency exception after the fetus becomes viable.

### CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that the Plaintiffs' Motion for a Permanent Injunction is GRANTED. It is further

**ORDERED AND ADJUDGED** that the Defendants are prohibited from enforcing FLA.STAT. §§ 390.0111(5), 390.0111(11), and 390.011(5) (as renumbered by the Act).